IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHRISTOPHER B. FLEMING, SR.,           *

     Plaintiff,                            *

v.                                      *           Civil Action No. GLR-22-581

WARDEN SHANE WEBER, et al.,            *

     Defendants.                           *

***

**<u>MEMORANDUM OPINION</u>**

THIS MATTER is before the Court on Defendant Warden Shane Weber's Motion to Dismiss, or in the Alternative, for Summary Judgment[1] (ECF No. 15) and Defendants Corizon Health, Inc. ("Corizon"), Janette Clark, Amy M. Stafford-Schroyer,[2] and Asresahegn Getachew's (collectively, "Medical Defendants") Motion to Dismiss, or in the Alternative, for Summary Judgment (ECF No. 21). The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2021). For the reasons outlined below, the Court will grant the Motions, construed as motions for summary judgment.

---

[1] Weber's Motion was filed together with a Motion to Seal certain medical records. (ECF Nos. 16, 17). The medical records directly pertain to the injury at issue in the Complaint, Plaintiff Christopher B. Fleming's date of birth is redacted, and the same records are filed elsewhere (ECF No. 22). Therefore, the Motion to Seal will be denied.

[2] Defendant Amy Stafford-Schroyer was formerly known as Amy Booth. (Mem. Supp. Mot. Dismiss ["Medical Defs.' Mot."] at 2, ECF No. 21-1). The Clerk will be directed to correct Stafford-Schroyer's name on the docket.

# I.   BACKGROUND

## A.   Fleming's Allegations

Plaintiff Christopher B. Fleming, Sr., is an inmate presently housed at Western Correctional Institution ("WCI") in Cumberland, Maryland. (Compl. at 1, ECF No. 1). He alleges that he suffered a torn Achilles tendon and was denied adequate medical care following the injury in violation of his Eighth Amendment rights. (Id. at 3−4).

On August 14, 2021, Fleming was injured during a basketball game, during which he "heard a loud pop and [felt a] massive pain shoot [through his] calf." (Id. at 3). He states that he tore his Achilles tendon and that after numerous sick calls and administrative remedy procedure ("ARP") requests, he was not given crutches or promptly taken to get surgery. (Id.). Fleming alleges that Defendants collectively were deliberately indifferent to his serious medical needs when they did not send him to the hospital for surgery immediately after the injury. (Id. at 4).

## B.   Medical Records

Medical Defendants filed extensive medical records concerning Fleming's treatment. (See generally Suppl. Mot. Dismiss ["Medical Rs."], ECF No. 22). On August 22, 2021, Fleming submitted a sick call request stating that "I snapped something in the back of my foot and it won't stop swelling up." (Id. at 100). Fleming stated that the injury occurred on August 21, 2021. (Id.). On August 24, 2021, Fleming saw Defendant Amy M. Stafford-Schroyer, R.N., complaining of pain in his right ankle following an injury he

sustained while playing basketball.[3] (Id. at 2). Stafford-Schroyer found that the ankle was bruised and warm to the touch in the Achilles area and she diagnosed him with a bruise/contusion and strain/sprain. (Id.). She ordered an x-ray and gave him an ACE wrap, cool compress, and ibuprofen. (Id. at 2−3).

On September 16, 2021, Fleming saw Stafford-Schroyer again, for right ankle and Achilles pain. (Id. at 6). Fleming reported that he "heard a pop" when playing basketball. (Id.). Stafford-Schroyer observed Fleming's ankle to exhibit tenderness, weakness, warmth to the touch, swelling, and some bruising. (Id.). She referred Fleming for a possible MRI and orthopedic consultation. (Id.).

On September 21, 2021, Vincent O. Nwuzor, RN, saw Fleming for his right ankle injury during which Fleming reported that he tore a tendon. (Id. at 8). Nwuzor noted that the x-ray on August 24, 2021 showed no fracture, but that the patient was walking with a limp. (Id.). Nwuzor referred Fleming to a provider for follow-up. (Id.).

On September 26, 2021, Defendant Janette Clark, NP submitted a consultation request for orthopedics. (Id. at 27). Clark noted that the x-ray showed no abnormal findings and that there was mild swelling of the lateral and medial ankle and bruising just above the proximal Achilles tendon. (Id.). She further noted a positive Thompson test[4] with a high suspicion for Achilles tendon rupture. (Id.).

---

[3] The record of this medical visit states that the injury occurred on August 22, 2021, (Medical Rs. at 2), however, elsewhere the date of the injury is noted as August 14, 2021, (id. at 6). This inconsistency is not material and will have no effect on the Court's analysis.

[4] A Thompson test "examines the integrity of the Achilles tendon by squeezing the calf. It is performed as a clinical test to identify the presence of a complete Achilles.

On October 24, 2021, Clark noted that Fleming was not approved for the orthopedic referral and was referred to onsite podiatry instead. (Id. at 10). She further noted that Fleming was scheduled to see the onsite podiatrist the week of October 18, 2022, but that he did not come to the appointment. (Id. at 10).

On November 2, 2021, Fleming saw Jessica Painter and received a large lace-up ankle support brace. (Id. at 31). On November 6, 2021, Fleming submitted a sick call request complaining that his Achilles tendon was still torn, he had not seen anyone in weeks, and he still did not have a soft cast. (Id. at 93).

On November 16, 2021, Fleming saw Mary A. Tabe, RN complaining of right ankle pain. (Id. at 36). He stated that his ankle is getting worse, and he is experiencing a burning sensation. (Id.). Tabe observed inflammation in the area, placed an ACE wrap, and gave Fleming a Procare boot. (Id.).

On November 19, 2021, Clark saw Fleming again for his right ankle pain. (Id. at 15). She noted that Fleming was scheduled to see the podiatrist on October 21, 2021, but that he was not listed correctly on the pass list and missed his appointment as a result. (Id.). On examination, Clark found a "complete retraction of achilles tendon that is palpable and visible." (Id.). She noted that he continues to have mild to moderate swelling. (Id.). Clark made another request for an orthopedic consult, for "high suspicion for complete achilles tendon rupture," noting that podiatry would not be back until December, so she was requesting an orthopedic consultation in an effort to prevent further delays in treatment.

rupture." See Thompson Test, Physiopedia, https://www.physiopedia.com/Thompson_Test (last visited Jan. 25, 2023).

(Id. at 15, 60). She continued his ibuprofen medication and also ordered topical Voltaren. (Id. at 15, 49). She referred him to a provider in two weeks, in order to track the orthopedic consult. (Id. at 16). On December 3, 2021, Clark noted that Fleming had been approved to see orthopedics. (Id. at 32).

On December 1, 2021, Fleming submitted a sick call request asking to be provided with a cane. (Id. at 94). The response from Michael Berger, MD was that a cane was not medically recommended. (Id.). On December 12, 2021, Fleming put in a sick call request stating that his torn achilles tendon is getting worse, and the medication is not stopping the pain and swelling. (Id. at 95).

On December 21, 2021, Fleming saw Roy Carls, MD at Precision Orthopedics and Sports Medicine. (Id. at 138). Carls' report explained that he no longer had any pain in his ankle. (Id.). However, Carls diagnosed achilles tendonitis, posterior tibial tendinitis, and a chronic, possibly multiple-ligament tear. (Id. at 139). Carls stated that he would like to get an MRI and would see Fleming again after it was conducted to discuss possible surgery. (Id. at 139).

On December 22, 2021, Fleming saw Berger. (Id. at 62). Berger's examination found "palpable delve noted approx. 4cm proximal to the Achilles insertion. 3+/5 plantarflexory strength and ROM to the right ankle. Unable to perform single limb heel raise on the right side." (Id.). Berger noted that an MRI of the right ankle was pending and advised Fleming that this is a chronic injury that may need reconstruction to repair the tendon. (Id.). Berger discussed conservative versus surgical management with Fleming and planned to follow up when results of MRI are completed. (Id.).

On December 26, 2021, Defendant Clark submitted a request for an MRI of the right ankle without contrast, with the presumed diagnosis being a rupture of the Achilles tendon. (Id. at 54, 73). She noted that he was seen by orthopedics on December 21, 2021, and a request for an MRI was made due to persistent pain and swelling and positive Thompson test. (Id.).

On January 18, 2022, Fleming saw Aaiysa Ansari-Jawal, MD for a provider visit regarding his right heel. (Id. at 67). Ansari-Jawal noted edema around the right heel with a positive Thompson test and mild bruising of the right ankle. (Id.). He diagnosed a chronic Achilles tendon rupture, prescribed chondroitin-glucosamine along with the capsaicin, and requested an MRI. (Id.). He also advised Fleming to avoid foods high in starch and sugar and to keep the right leg elevated. (Id. at 68). Ansari-Jawal submitted the consult requests for orthopedics the same day, noting that the oral pain medications and elevation had failed. (Id. at 58).

Fleming had an MRI on February 7, 2022 which showed a 50% rupture of the Achilles tendon.[5] (Id. at 137). On February 14, 2022, Joginder Mehta, MD saw Fleming for the right heel pain. (Id. at 74). Mehta noted that the MRI completed on February 7, 2022 indicated a "rupture of the right achilles tendon involving 50% or more of the fibers of myotendinous junction and extending to the level of the remaining distal tendon, with a rounded contour measuring up to 16 mm in diameter." (Id.). Mehta requested an orthopedic

---

[5] A record dated December 21, 2021, indicates that Cynthia O. Taferi, RN saw Fleming for "post trip return from UPMC western Maryland for MRI." (Medical Rs. at 65). However, there is no record of an MRI in December 2021.

consult and provided Fleming with crutches and a right ankle brace. (Id. at 75−77, 112). On February 15, 2022, Fleming was approved for the orthopedic consult. (Id. at 51, 111). On March 3, 2022, Fleming saw Carls for a follow-up after his MRI. (Id. at 98). Carls' report explained that Fleming "went up steps last Friday and [his] ankle popped and [he] felt tearing." (Id.). Carls diagnosed chronic Achilles tendinitis. (Id. at 99). He noted that "[t]he patient has been treated for this problem conservatively, including rest, activity modifications, avoidance of aggravating factors, without relief of symptoms, which include limitations in activities of daily living." (Id.). Carls discussed with Fleming the option of continuing to live with the symptoms or proceeding to surgery. (Id.). Because of the lack of improvement with non-operative management over time and the nature of the injury, Carls recommended surgery for optimal outcome and symptom relief. (Id.). Carls noted that the MRI of the right ankle showed an incomplete rupture of the Achilles tendon. (Id.).

On March 8, 2022, Fleming saw Clark to review the orthopedic report. (Id. at 41). She noted persistent pain and swelling since injury, the positive Thompson test and that the MRI showed an incomplete rupture of the Achilles tendon. (Id.). Rest and splinting had failed, so Clark's plan was for surgery with turndown graft and hardware. (Id.). The same day, Clark submitted the consultation request for orthopedic surgery. (Id. at 52). Corizon approved the surgery on March 16, 2022, after which Clark ordered pre-op labs. (Id. at 22, 24). Clark then saw Fleming on March 26, 2022 for pre-op history and physical examination and lab work. (Id. at 25).

On April 21, 2022, Fleming underwent Achilles tendon repair surgery by Carls, and was admitted to the WCI infirmary following the surgery. (Id. at 18). Fleming saw Beverly

J. McLaughlin, NP in the infirmary, who noted that he tolerated surgery well and was in no apparent distress. (Id.). McLaughlin suggested that Fleming see Carls for follow up in 10−14 days. (Id.). On April 22, 2022, he was approved for the orthopedic surgery follow-up requested by McLaughlin. (Id. at 38, 56).

Fleming had a post-operative follow-up appointment with Carls on May 3, 2022, when the dressing, staples, and stitches were removed. (Id. at 108). Fleming was fitted with a boot for stability and recommended for another follow-up in six weeks. (Id. at 109).

**C.     Administrative Filings**

Fleming filed an ARP on September 16, 2021, stating that he was injured three weeks ago, tore his Achilles tendon, and had only been to medical for an x-ray. (ARP WCI1618-21 at 1, ECF No. 15-2). He stated that he needed an MRI and surgery, he wrote to medical several times, and needed to be seen by medical because his foot was turning black. (Id.). Fleming filed a second ARP on October 3, 2021, complaining that his torn Achilles tendon is getting worse, he does not understand why he was given a prescription for muscle relaxers, and he still has not had an MRI. (ARP No. WCI1784-21 at 1, ECF No. 15-6). On November 3, 2021, Fleming appealed the ARP No. WCI1784-21 to the Commissioner of Correction arguing that he should be sent to the hospital, was denied orthopedic care, and that the Warden was negligent. (Id. at 2). The Appeal was dismissed because it was repetitive. (Id.).

8

On February 12, 2022, Fleming filed an ARP stating that he fell going up the steps and injured his right foot again.[6] (Suppl. Compl. at 24). He stated that he was in massive pain and was told to fill out a sick call form. (Id.). He requested crutches and to be seen by medical. (Id.). On March 3, 2022, Fleming appealed ARP No. WCI0257-22 to the Commissioner of Corrections, stating that he fell and reinjured his foot on February 11, 2022, but that the doctor only prescribed pain medication and did not examine his foot or send him to the hospital for surgery. (Id. at 21).

In support of his Motion to Dismiss, Weber filed the declaration of Alicia Cartwright, a Correctional Officer Sergeant assigned to the ARP office at WCI. (Cartwright Decl., ECF No. 15-4). Cartwright states that "[t]he ARP index demonstrates that in the period of time from August 1, 2021, through June 15, 2022, Mr. Fleming submitted two (2) ARPs at WCI:  ARP WCI-1618-21 and ARP WCI-1784-21." (Id. ¶ 4). F. Todd Taylor, Jr., Director of the Inmate Grievance Office, claims that Fleming has not filed any grievances with the IGO concerning his Achilles injury. (Taylor Decl. ¶ 3, ECF No. 15-5).

**E.    Procedural History**

On March 10, 2022, Fleming filed this Complaint alleging that Defendants Weber and Corizon violated his rights by failing to provide appropriate medical care and that they acted with deliberate disregard concerning his health. (Compl. at 3−4). On June 21, 2022, Weber filed his Motion to Dismiss, or, in the Alternative, for Summary Judgment. (ECF No. 15). Fleming opposed to the Motion on August 15, 2022. (ECF No. 25). Medical

---

[6] This ARP was submitted into the record by Fleming. (Suppl. Compl. at 23, ECF No. 32). It was not included with the records submitted by Defendant Weber.

Defendants filed their Motion to Dismiss, or in the Alternative, for Summary Judgment, on July 18, 2022. (ECF No. 21). Fleming filed separate responses to the Motion for Stafford-Schroyer (ECF No. 26), Corizon (ECF No. 27), Clark (ECF No. 29), and Getachew (ECF No. 28) on August 15, 2022 and August 22, 2022.[7] Fleming also filed documents that were docketed as a "supplement" to the Complaint, but which appear to be evidence in support of his responses in opposition to the Motions. (ECF No. 32). Finally, the Medical Defendants filed a Reply to Fleming's responses on August 31, 2022. (ECF No. 33).

## II.   DISCUSSION

### A.   Conversion

Both Weber and the Medical Defendants styled their Motions as motions to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56. Motions styled in this manner implicate the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cnty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or

---

[7] Fleming also filed documents purporting to be responses to the declarations of Defendants Ansari-Jawal and Nwuzor, however these Defendants have not appeared in the case and did not file declarations. (ECF Nos. 30, 31).

simply not consider it.'" <u>Wells-Bey v. Kopp</u>, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. <u>See</u> <u>Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.</u>, 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. <u>See</u> <u>Moret v. Harvey</u>, 381 F.Supp.2d 458, 464 (D.Md. 2005) (citing <u>Laughlin v. Metro. Wash. Airports Auth.</u>, 149 F.3d 253, 260–61 (4th Cir. 1998)).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." <u>E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.</u>, 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" <u>Harrods Ltd. v. Sixty Internet Domain Names</u>, 302 F.3d 214, 244 (4th Cir. 2002) (quoting <u>Evans v. Techs. Applications & Serv. Co.</u>, 80 F.3d 954, 961 (4th Cir. 1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified

reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d).

"The Fourth Circuit places 'great weight' on the affidavit requirement." Nautilus Ins. Co. v. REMAC Am., Inc., 956 F.Supp.2d 674, 683 (D.Md. 2013) (quoting Evans, 80 F.3d at 961). However, non-compliance may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary." Harrods, 302 F.3d at 244. Courts place greater weight on the need for discovery "when the relevant facts are exclusively in the control of the opposing party," such as "complex factual questions about intent and motive." Id. (quoting 10B Wright, Miller & Kane, Federal Practice & Procedure § 2741, at 419 (3d ed. 1998)) (internal quotation marks omitted).

Here, the Court concludes that both requirements for conversion are satisfied. Fleming was on notice that the Court might resolve the Motions under Rule 56 because Defendants styled their Motions in the alternative for summary judgment and presented extra-pleading material for the Court's consideration. See Moret, 381 F.Supp.2d at 464. In addition, the Clerk informed Fleming about the Motions and the need to file an opposition. (See Rule 12/56 Letters, ECF Nos. 18, 23). Fleming filed Responses in Opposition but did not include a request for more time to conduct discovery. Because the Court will consider documents outside of Fleming's Complaint in resolving Defendants' Motions, the Court will treat the Motions as motions for summary judgment.

B. **Standard of Review**

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459,

465 (4th Cir. 2001) (citing <u>Hooven-Lewis v. Caldera</u>, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248; <u>accord</u> <u>Hooven-Lewis</u>, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. <u>Anderson</u>, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986) (quoting <u>Anderson</u>, 477 U.S. at 247).

## C.   <u>Analysis</u>

### 1.   **Exhaustion**

Weber raises the affirmative defense that Fleming has failed to exhaust his administrative remedies. (Weber Mot. Dismiss Alt. Summ. J. ["Weber Mot."] at 7, ECF No. 15-1). If Fleming's claims have not been properly presented through the administrative remedy procedure, they must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e. The PLRA provides, in pertinent part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002); see Chase v. Peay, 286 F.Supp.2d 523, 528 (D.Md. 2003), aff'd, 98 F.App'x 253 (4th Cir. 2004).

Although exhaustion under § 1997e(a) is not a jurisdictional prerequisite, the plaintiff must nonetheless exhaust before this Court will hear the claim. See Jones v. Bock, 549 U.S. 199, 215–16 (2007); Anderson v. XYZ Corr. Health Servs., Inc., 407 F.2d 674, 682 (4th Cir. 2005). The exhaustion requirement "allow[s] a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." Bock, 549 U.S. at 219. It is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. Chase, 286 F.Supp.2d at 530.

Because the Court may not consider an unexhausted claim, see Bock, 549 U.S. at 220, exhaustion prior to federal suit is mandatory. Therefore, a court may not ordinarily excuse a failure to exhaust. Ross v. Blake, 578 U.S. 632, 639 (2016) (citing Miller v.

French, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion")).

Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." Woodford v. Ngo, 548 U.S. 81, 88, 93 (2006). Importantly, however, the court must ensure that "any defects in exhaustion were not procured from the action or inaction of prison officials." Aquilar-Avellaveda v. Terrell, 478 F.3d 1223, 1225 (10th Cir. 2007); see Kaba v. Stepp, 458 F.3d 678, 684 (7th Cir. 2006). Moreover, an inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a); see Ross, 578 U.S. at 636. An administrative remedy is not "available" where the prisoner, "through no fault of his own, was prevented from availing himself of it." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008) (citing Aquilar-Avellaveda, 478 F.3d at 1225); Kaba, 458 F.3d at 684.

In Maryland prisons, for the type of grievance asserted by Fleming, the Administrative Remedy Procedure is the administrative process that must be exhausted. Md. Code Regs. 12.02.28.02(B)(1) (2018); Md. Code Regs. 12.02.28.05. First, a prisoner must file an ARP with the warden within thirty days of the incident at issue. Md. Code Regs. 12.02.28.05(D)(1) (requiring filing with the "managing official"); Md. Code Regs. 12.02.28.02(B)(14) (defining "managing official" as "the warden or other individual responsible for management of the correctional facility"); Md. Code Regs. 12.02.28.09(B) (setting the thirty-day deadline). Second, if the ARP is denied, or the inmate does not receive a timely response, a prisoner must file an appeal with the Commissioner of Correction within thirty days. Md. Code Regs. 12.02.28.14(B)(5). If the appeal is denied,

the prisoner must appeal within thirty days to the Inmate Grievance Office ("IGO"). <u>See</u> Md. Code. Ann., Corr. Servs. §§ 10-206, 10-210 (West 2022); Md. Code Regs. 12.07.01.05(B). If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. Corr. Servs. § 10-207(b)(1); <u>see</u> Md. Code Regs. 12.07.01.07(B). An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. Corr. Servs. § 10-207(b)(2)(ii). If the grievance is dismissed, the "order of dismissal shall be forwarded to the complainant within 60 days after the complaint was submitted to the Office." Corr. Servs. § 10-207(b)(2)(i).

Exhaustion requires full completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." <u>Woodford v. Ngo</u>, 548 U.S. 81, 88 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so <u>properly</u> (so that the agency addresses the issues on the merits).'" <u>Woodford</u>, 548 U.S. at 90 (quoting <u>Pozo v. McCaughtry</u>, 286 F.3d 1022, 1024 (7th Cir. 2002) (emphasis in original)).

In response to Weber's affirmative defense that Fleming did not exhaust his administrative remedies, Fleming explained that he filed two ARP's "begging for help," but that they were dismissed. (Opp'n Weber Mot. at 3, ECF No. 25). Fleming points to his appeal of ARP No. WCI-1784-21 where he states that he "wanted a[n] IGO hearing." (<u>Id.</u>; <u>see also</u> ARP WCI-1784-21 at 2, ECF No. 15-6). That appeal was dismissed for procedural reasons, and there is no evidence that Fleming proceeded with an appeal to the IGO. There

is also no evidence that Fleming's other ARP responses were appealed to the IGO.[8] F. Todd Taylor, Jr., Director of the IGO, declares that Fleming has not filed any grievances with the IGO concerning his injury. (Taylor Decl. ¶ 3). Fleming offers no evidence to dispute Taylor's declaration and does not claim that he appealed any ARP to the IGO. Therefore, because the evidence in the record shows that Fleming did not complete the administrative remedies process, his Complaint against Weber must be dismissed without prejudice for failure to exhaust administrative remedies.[9]

### 2.    Deliberate Indifference

The Medical Defendants argue that they are entitled to summary judgment because Fleming cannot establish that they were deliberately indifferent to his serious medical need. (Medical Defs.' Mot. Dismiss Alt. Summ. J. ["Medical Defs.' Mot."] at 15−16, ECF No. 21). Specifically, Medical Defendants contend that they provided constitutionally adequate care to Fleming and he simply disagrees with the course of treatment provided. (Id.). At bottom, the Court agrees and finds that the record evidence, viewed in the light most favorable to Fleming, does not establish that his Eighth Amendment rights were violated due to denied or delayed medical treatment.

---

[8] There is a discrepancy in the record as to how many ARPs Fleming filed. Both he and Cartwright say that he filed two ARP's (Cartwright Decl. ¶ 4, ECF Nos. 15-4; Opp'n Weber Mot. at 3), however, Fleming submitted a copy of an additional ARP (Suppl. Compl. at 23). Nevertheless, there is no indication that Fleming exhausted his administrative remedies as to any ARP. Therefore, the number he filed is inconsequential.

[9] Because the Complaint against Weber is being dismissed without prejudice for failure to exhaust administrative remedies, it is not necessary to address Weber's remaining arguments.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. Gregg v. Georgia, 428 U.S. 153, 173 (1976); see also Hope v. Pelzer, 536 U.S. 730, 737 (2002); Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016); King v. Rubenstein, 825 F.3d 206, 219 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." De'Lonta v. Angelone, 330 F.3d 630, 633 (4th Cir. 2003) (citing Wilson v. Seiter, 501 U.S. 294, 297 (1991)); accord Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017).

To prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Kingsley, 877 F.3d at 543. A prisoner plaintiff must allege and provide some evidence he was suffering from a serious medical need and that defendants were aware of his need for medical attention but failed to either provide it or ensure it was available. See Farmer v. Brennan, 511 U.S. 825, 834–37 (1994); see also Heyer v. U.S. Bureau of Prisons, 849 F.3d 202, 209–10 (4th Cir. 2017); King, 825 F.3d at 218; Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. See Hudson v. McMillian, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); accord Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendant was subjectively reckless in treating or failing to treat the

serious medical condition. See Farmer, 511 U.S. at 839–40; see also Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). Indeed, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (quoting Farmer, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through other evidence that tends to establish the defendant knew about the problem. Scinto, 841 F.3d at 226. This includes evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. (quoting Farmer, 511 U.S. at 842).

Mere negligence or malpractice does not rise to a constitutional level. Donlan v. Smith, 662 F.Supp. 352, 361 (D.Md. 1986) (citing Estelle, 429 at 106); see also Scinto, 841 F.3d at 225. "Deliberate indifference is 'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" (quoting Farmer, 511 U.S. at 835 (alteration in original)); Russell v. Sheffer, 528 F.2d 318, 318–19 (4th Cir. 1975) (citing Gittlemacker v. Prasse, 428 F.2d 1, 6 (3rd Cir. 1970)) ("[M]istreatment or non-treatment must be capable of characterization as 'cruel and unusual punishment' in order to present a colorable claim . . . .").

Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. See Lightsey, 775 F.3d at 179 (physician's act of prescribing treatment raises a fair inference that he believed treatment was necessary and that failure

to provide it would pose an excessive risk). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." <u>Wright v. Collins</u>, 766 F.2d 841, 849 (4th Cir. 1985). Additionally, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." <u>United States v. Clawson</u>, 650 F.3d 530, 538 (4th Cir. 2011) (quoting <u>Bowring v. Godwin</u>, 551 F.2d 44, 47–48 (4th Cir. 1977)).

It is undisputed that Fleming suffered from a serious medical need when he ruptured his Achilles tendon. (Medical Defs.' Mot. at 13). Fleming contends that Medical Defendants were deliberately indifferent to this serious medical need because they failed to send him to the hospital for emergency surgery. (Compl. at 3−4). However, the declaration of Defendant Janette Clark, as well as numerous records of other provider visits, indicate that Fleming's injury was not a medical emergency and that it was amenable to other, more conservative treatment options. (Clark Decl. at 8, ECF No. 21-3 (declaring that an Achilles tendon rupture "is not a medical emergency and appropriate workup must be completed prior to any surgery"); Medical Rs. at 18, 25, 62, 67, 99 (various providers indicate the condition is chronic, conservative measures failed, and surgery may be required)). A podiatrist and orthopedic surgeon both referenced the failure of conservative measures when suggesting surgery. (Medical Rs. at 62, 99). Berger, the podiatrist, discussed "conservative vs surgical management" with Fleming, (<u>id</u>. at 62), and Carls, the orthopedic surgeon, discussed "continuing to live with the symptoms versus proceeding

with surgery," (id. at 99). Fleming offers no support for his position that his injury was an emergency and surgery should have been provided immediately; instead, he simply disagrees with the decisions by providers to attempt conservative, non-surgical treatment options.

The record does show that Fleming experienced delays in care between the time of his injury, seeing a specialist, getting an MRI, and finally undergoing surgery. But there is no evidence that Fleming suffered any harm from the delays, that the delays were unreasonable or excessive, or that individual Medical Defendants, each of whom requested provider visits and orthopedic consultations upon examining Fleming, were responsible for the delays. Clark requested an orthopedic consult the first time she examined Fleming. (Id. at 27). When that request was denied in favor of the onsite podiatrist, Clark again requested the orthopedic consult after Fleming missed the podiatrist appointment. (Id. at 15, 60). Stafford-Schroyer also requested an orthopedic consult upon her initial examination of his injury. (Id. at 6–7). Getachew never saw or examined Fleming. (Getachew Decl. at 2, ECF No. 21-2). There is no indication that any of these providers caused delays in care by their action or inactions. While Corizon may be the most culpable party in regard to any delayed treatment, Fleming does not allege any specific facts to support his conclusive allegation that it has "establish[ed] unconstitutional procedures and policies related to inmate access to appropriate medical care." (Compl. at 3). Likewise, the record does not reflect any policy or procedure that would show Corizon to be deliberately indifferent to Fleming's serious medical need.

Fleming also complains that Stafford-Schroyer was deliberately indifferent to his serious medical need because he was not given crutches or a wheelchair. (Id. at 4). However, numerous medical reports indicate that Fleming was able to walk without the assistance of crutches or a wheelchair. (Medical Rs. at 8 ("ambulating with a limp" on September 21, 2021), 16 ("limp due to right ankle pain" on November 19, 2021), 26 ("steppage gait" on March 27, 2022), 62 (Fleming complained of "ambulatory difficulty" on December 22, 2021), 67 ("complaints of walking with a limp" on January 18, 2022)). The records reflect that Fleming requested a cane once, but that Berger found that a cane was not medically recommended. (Id. at 94). Fleming was provided with a support brace, (id. at 31), an ACE bandage and boot, (id. at 36), lace up ankle support, (id. at 43), and eventually, crutches, (id. at 75−76). Thus, efforts were made to ameliorate any issues Fleming had with walking.

Reviewing the evidence in the light most favorable to Fleming, there is nothing in the record to show that any Defendant was deliberately indifferent to his serious medical needs. Accordingly, Defendants' Motions, construed as motions for summary judgment, will be granted.[10]

---

[10] Vincent Nwuzor, R.N. and Aaiysa Ansari-Jawal, M.D. were not served with the Complaint. Nevertheless, the Complaint against them will be dismissed without prejudice. Fleming's only factual allegation against them is that they chose not to send him to the hospital, (Compl. at 4), but Fleming has not shown that the failure to send him to the hospital constituted deliberate indifference to a serious medical need.

## III.    CONCLUSION

For the foregoing reasons, the Court will grant Defendant Warden Shane Weber's Motion to Dismiss, or in the Alternative, for Summary Judgment (ECF No. 15) and Medical Defendants Motion to Dismiss, or in the Alternative, for Summary Judgment (ECF No. 21), and deny Weber's Motion to Seal (ECF No. 17).

A separate Order follows.

Entered this 14th day of February, 2023.


<u>            /s/            </u>
George L. Russell, III
United States District Judge